## COFFMAN v. CASTNER et al.

(Circuit Court of Appeals, Fourth Circuit. May 3, 1898.)

### No. 231.

TRADE-MARKS AND TRADE-NAMES—GEOGRAPHICAL NAMES—"POCAHONTAS COAL."
  No one has, or can acquire, the exclusive right to use the name "Pocahontas," as descriptive of either the locality or character of coal mined in what is known as the "Great Pocahontas Coal Field of Virginia and West Virginia," but all producers of coal in that section have the right to so

[1] Rehearing denied May 19, 1898.

use it in common, as the extensive product of that region has become widely known as "Pocahontas Coal." [1]

Appeal from the Circuit Court of the United States for the District of West Virginia.

This was a suit in equity by Samuel Castner, Jr., and Henry B. Curran against W. H. Coffman to restrain defendant from alleged wrongful use of a trade-name. There was a judgment for plaintiffs, and the defendant prosecutes this appeal.

S. C. Graham, for appellant.

Arthur v. Briesen (J. Walter Douglass and Henry E. Everding, on the brief), for appellees.

Before GOFF, Circuit Judge, and BRAWLEY and PURNELL, District Judges.

GOFF, Circuit Judge. This is an appeal from an order of the circuit court for the district of West Virginia entered on the 5th day of May, 1897, in the chancery cause of Samuel Castner, Jr., and Henry B. Curran, trading under the firm name of Castner & Curran, against W. H. Coffman, doing business under the name and style of Pocahontas Coke & Coal Company, and also as W. H. Coffman Coke Company. By such order the defendant below (appellant here) was in his own name, and in the name of the Pocahontas Coke & Coal Company, and also as the W. H. Coffman Coke Company, together with his servants, attorneys, and associates, restrained and inhibited from using the name "Pocahontas" or "Pocahontas Flat Top" in connection with his business, the court being of the opinion that "the complainants have a right to use the said word 'Pocahontas' for the purpose of indicating that the coal was from the Pocahontas field, and that they have the sole right to use said word as indicating the character of coal they sell." From this decree the defendant below, under the provisions of section 7 of the act approved March 3, 1891, entitled "An act to establish circuit court of appeals, and to define and regulate in certain cases the jurisdiction of the courts of the United States, and for other purposes," sued out this appeal.

The bill alleges that about the year 1882, in the state of Virginia, a tract or field of smokeless bituminous or semibituminous coal was opened and mined by the Southwest Virginia Improvement Company, a corporation organized and doing business under the laws of the state of Virginia; that shortly thereafter, but still in the year 1882, the said corporation named their mine "Pocahontas," and began selling the coal therefrom as "Pocahontas" coal, having adopted the trade-mark "Pocahontas" as designating its said output; that prior to the 1st day of January, 1884, Castner & Co., Limited, a partnership formed under the laws of the state of Pennsylvania, did purchase from the said Southwest Virginia Improvement Company the coal so mined, and did ship and sell the same principally at tide-water points under the name of "Pocahontas" coal; that they, as such partnership asso-

[1] As to the use of geographical names as trade marks and names generally, see note to Hoyt v. J. T. Lovett Co., 17 C. C. A. 657.

ciation, dealt in, inspected, shipped, and sold from said region or field as "Pocahontas" coal in large quantities, and under the license of the Southwest Virginia Improvement Company advertised, shipped, and billed the same "Pocahontas" coal, uniformly designating it as such coal; that in the year 1889 the complainants became the successors and assigns of said Castner & Co., Limited, and continued the same business under the name of Castner & Curran, dealing in and selling large quantities of said coal under the trade-mark designation of "Pocahontas" coal, shipping, billing, and advertising the same as "Pocahontas" coal, and as "Pocahontas Flat Top" coal, and that they, by reason of the careful inspection and purification of their coal, greatly increased from year to year the sale of the same; that complainants and their predecessor, Castner & Co., Limited, from the year 1883 until the bringing of this suit, during the first 12 years thereof with the license of the Southwest Virginia Improvement Company, and thereafter as owners of the said trade-mark, uninterruptedly carried on said coal business, and have continuously inspected, shipped, and sold large quantities of coal under the said trade-mark of "Pocahontas"; that on April 1, 1895, by an assignment in writing duly executed by the Southwest Virginia Improvement Company, the complainants became the owners of the entire right and title, interest and good will in and to the trade-mark "Pocahontas," with the exclusive right to use said word as a designation for all coal thereafter sold by them from said field, and became vested also with the exclusive right to sue and recover for all gains, profits, and damages arising out of past, present, or future infringements of the same; that they have devoted much time and expended large sums of money in inspecting, selecting, grading, and maintaining the superior quality and purity of the said coal, whereby it has acquired, and now possesses, a great reputation in the markets of the world under the name of "Pocahontas" or "Pocahontas Flat Top" coal, and that it has been and is now much sought after by dealers and the public; that complainants have the sole and exclusive right to the use of the word-symbol "Pocahontas" as a trade-mark for coal, and that it is of great value to them in their business. It is also set forth in the bill that the public and the dealers in coal have generally acquiesced in complainants' exclusive rights to such use, and that they have not knowingly permitted the unlawful use of such trade-mark by others; that prior to November 1, 1896, complainants controlled the output of the various collieries in what is known as the "Great Flat Top Coal Region," including the Indian Ridge Coal & Coke Company; that they sold so much of this output as came up to the grade of "Pocahontas" coal in quantity, purity, and size as "Pocahontas" coal, but that the output of the Indian Ridge Company was impure, and required special care and attention, and yielded but a small proportion of the "Pocahontas" coal, as it was marketed by complainants; that the defendant, W. H. Coffman, is a factor or agent engaged in the sale of coal and coke at Bluefield, W. Va., and elsewhere, selling and advertising for sale bituminous and semibituminous coal from the Indian Ridge colliery, which is inferior in quality and purity to the coal sold by complainants, and is not of the standard as to quality and purity established

by them; that he, intending to deceive dealers and the public, and to cause purchasers of his coal to believe that the same was sold by complainants, or is of the quality sold by them, has at Bluefield and elsewhere offered for sale and sold a very inferior and impure coal under the name and designation of "Pocahontas," and has, in advertising and selling the same, used the word-symbol "Pocahontas," and in letters, notes, and bills has displayed the words "Pocahontas Coal," or "Pocahontas Flat Top Coal," whereby the purchasers of his coal are liable to be and will be deceived, and caused to purchase defendant's coal as that sold by complainants; that as a matter of fact purchasers have been so deceived, and that the reputation of "Pocahontas" coal has been thereby tainted; that the defendant intends to and will continue so to do, unless prevented by the order of the court below. Other statements in the bill are not referred to, the same being unnecessary so far as the questions we are now to consider are concerned. A large number of affidavits were filed by complainants and defendant, which, as well as the answer of the defendant, treated as an affidavit, and the exhibits with it, and the bill, were read and considered by the court in disposing of the motion for an injunction.

Certain propositions of law, now well established, applicable to this case, will be referred to in the outset as guiding us in our investigation of the same, and as plainly indicating, in connection with the facts as we find them, the result we now announce. A trade-mark is intended to designate the origin of the particular article to which it is affixed, or to which it specially refers, and it gives notice to the world who the producer of that article was. A name may be used for this purpose, or a certain mark or peculiar device may be employed, provided they have not theretofore been appropriated by others for the same purpose. But the right to select such names, marks, and devices is governed by certain rules and limitations which have been found and announced by the courts. On this point the supreme court of the United States in Canal Co. v. Clark, 13 Wall. 311, 323, said:

"The trade-mark must therefore be distinctive in its original signification, pointing to the origin of the article, or it must have become such by association; and there are two rules which are not to be overlooked: No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured, rather than protected, for competition would be destroyed. Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection. As we said in the well-considered case of Amoskeag Mfg. Co. v. Spear, 2 N. Y. Super. Ct. 599: 'The owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms, or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any word, letters, figures, or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. He has no right to appropriate a sign or symbol which, from the nature of the fact that it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose.' And it is obvious that the same reasons which forbid the exclusive appropriation of generic names, or of those merely descriptive of the article manufactured, and which can be

employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer; and, could they be appropriated exclusively, the appropriation would result in mischievous monopolies. Could such phrases as 'Pennsylvania wheat,' 'Kentucky hemp,' 'Virginia tobacco,' or 'Sea Island cotton' be protected as trade-marks; could any one prevent all others from using them, or from selling articles produced in the districts they describe under those appellations,—it would greatly embarrass trade, and secure exclusive rights to individuals in that which is the common right of many. It can be permitted only when the reasons that lie at the foundation of the protection given to trade-marks are entirely overlooked. It cannot be said that there is any attempt to deceive the public when one sells as Kentucky hemp or as Lehigh coal that which in truth is such, or that there is any attempt to appropriate the enterprise or business reputation of another who may have previously sold his goods with the same description. It is not selling one man's goods as and for those of another. Nothing is more common than that a manufacturer sends his products to market, designating them by the name of the place where they were made. But we think no case can be found in which other producers of similar products in the same place have been restrained from the use of the same name in describing their goods. * * * It is only when the adoption or imitation of what is claimed to be a trade-mark amounts to a false representation, express or implied, designed or incidental, that there is any title to relief against it. True it may be that the use by a second producer, in describing truthfully his product, of a name or a combination of words, already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product; but if it is just as true in its application to his goods as it is to those of another who first applied it, and who therefore claims an exclusive right to use it, there is no legal or moral wrong done. Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth."

In the same case it was held that the word "Lackawanna," the name of a section of the state of Pennsylvania, could not be combined with the word "coal," and made a trade-mark which would be protected by law, for the reason that every one who mined coal in the valley of the Lackawanna was entitled to the right of representing it as coming from that region, and as being Lackawanna coal.

In Mill Co. v. Alcorn, 150 U. S. 460, 466, 14 Sup. Ct. 151, the supreme court says:

"The appellant was no more entitled to the exclusive use of the word 'Columbia' as a trade-mark than he would have been to the use of the word 'America,' or 'United States,' or 'Minnesota,' or 'Minneapolis.' These merely geographical names cannot be appropriated, and made the subject of an exclusive property. They do not, in and of themselves, indicate anything in the nature of origin, manufacture, or ownership; and in the present case the word 'Columbia' gives no information on the subject of origin, production, or ownership."

### In the same case it was said:

"These cases establish the following general propositions: (1) That to acquire the right to the exclusive use of a name, device, or symbol as a trade-mark it must appear that it was adopted for the purpose of identifying the origin or ownership of the article to which it is attached, or that such trade-mark must point distinctively, either by itself or by association, to the origin, manufacture, or ownership of the article on which it is stamped. It must be designed as its primary object and purpose, to indicate the owner or producer of the commodity, and to distinguish it from like articles manufactured by others. (2) That if the device, mark, or symbol was adopted or placed upon

the article for the purpose of identifying its class, grade, style, or quality, or for any purpose other than a reference to or indication of its ownership, it cannot be sustained as a valid trade-mark. (3) That the exclusive right to the use of the mark or device claimed as a trade-mark is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production. (4) Such trade-mark cannot consist of words in common use as designating locality, section, or region of country."

In Laughman's Appeal, 128 Pa. St. 1, 18 Atl. 415, it was held that when the article to which a geographical name is applied is the product of the place named, the term cannot be used as a trade-name by one to the exclusion of others, owners of like products of the same place; hence the term "Sonman," which has received a distinct geographical recognition from the public, it being the name of a large boundary of land containing a number of private estates owned by different persons, all of whom are engaged in the same business of mining and shipping coal, and having within its limits a village of the same name, cannot be appropriated by one of such persons as a trade-name to the exclusion of the others, although the tract is not an independent region, and cannot be considered a separate coal basin or subbasin.

In the case of Iron Co. v. Uhler, 75 Pa. St. 467, the court said:

"Glendon is the name of the town in which the business of each party is located and carried on. It is an incorporated borough. Being, then, the name of an incorporated town, the main question is whether the appellant lawfully has the exclusive right to use it as a trade-mark. It is conceded, as a general rule, that the name of a town or city cannot be so appropriated as the exclusive property of any one. This view is well sustained by authority. High, Inj. 673; Bisp. Eq. 411; Wolfe v. Goulard, 18 How. Prac. 64; Lead Co. v. Masury, 25 Barb. 416; Newman v. Alvord, 49 Barb. 588; Candee· v. Deere, 54 Ill. 439; Canal Co. v. Clark, 13 Wall. 311. It is contended by the appellant that this case is taken out of the general rule, inasmuch as the trade-mark was adopted prior to the incorporation of the borough, and before there was any town at that place. No authority is cited which supports this distinction. The case of Woterspoon v. Currie, 23 Law T. 443, is clearly distinguishable. It is known as the 'Glenfield Starch Case.' It is true, the injunction was there granted, but the complainant and respondent were not both engaged in carrying on the business in the same town or city. There was no town—no city—there. The lord chancellor says: 'Glenfield is not a town; * * * it is not a parish; it is not a hamlet; it is not a district of any special character; but it was an estate of that name upon which some people seem to have erected some houses or manufactories, and upon which now some sixty people are living.' It will not do to apply to an incorporated borough in this state the same rule that may be applicable to an estate in England. Such a borough is essentially of a public nature; the estate is of a more private character. The name which an individual may give to his estate is unlike that which legislative sanction has given to a municipal corporation. The rights of the public in each are radically different. The appellees did not falsely represent the place of their business location. Their pig iron was actually manufactured within the borough of Glendon. * * * The appellees put upon their pigs the initials of their firm and the name of their town. That name was Glendon to the whole world. It cannot be that the previous appropriation by the appellants of the word which now is the name of the town prevents any other manufacturer of pig iron, within its limits, from using the same word. If it be so now, it may continue through all coming time. The boundaries of the town may be enlarged. The borough may grow into a city. The manufactories of pig iron may be multiplied, yet the word most expressive to indicate their location must be denied to all.

save one. * * * We see nothing in the facts of this case, even as found by the master, to take it out of the general rule which denies to one the exclusive use as a trade-mark of the name of the town in which the same kinds of goods are manufactured by others."

In Connell v. Reed, 128 Mass. 477, Chief Justice Gray says:

"Although the master reports that there was no evidence that any other person than the plaintiffs or their agents, had ever used these words ["East Indian"] in connection with the manufacture and sale of medicines, it is at least doubtful whether words in common use as designating a vast region of country and its products can be appropriated by any one as his exclusive trade-mark, separately from his own or some other name in which he has a peculiar right."

In the case of Evans v. Von Laer, 32 Fed. 153, Judge Colt held that, as Montserrat was the name of an island in the West Indies from which both the plaintiff and defendant imported lime juice, the former, in the absence of fraud, was not entitled to the exclusive use of the word "Montserrat" as a designation for lime juice, even though the plaintiff's article may have acquired a high reputation for purity and strength, while that of the defendant was of an inferior quality.

In Salt Co. v. Burnap, 20 C. C. A. 27, 73 Fed. 818, 43 U. S. App. 243, 250, the court said:

"It is well settled, and we have just had occasion to decide in this court, that words merely descriptive of the character, quality, and composition of the article or of the place where it is manufactured or produced cannot be monopolized as a trade-mark. California Fig Syrup Co. v. Frederick Stearns & Co., 43 U. S. App. 234, 20 C. C. A. 22, and 73 Fed. 812; Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625; Canal Co. v. Clark, 13 Wall. 311. The name 'Genessee,' when used in connection with the complainant's salt, obviously refers to the place of its production. The complainant could, therefore, assert no trade-mark property in it."

In the case of Candee v. Deere, 54 Ill. 439, the court held that there can be no trade-mark in the words "Moline Plows," as Moline was the name of the town in which the plows were made, and said:

"Is it possible—can it be tolerated for a single moment—that a maker of plows at Moline shall not be permitted to sell his work as a Moline plow; to advertise them in every form as the Moline plow? Would it not be the truth: and shall a manufacturer be prevented from publishing to the world where his wares are made? * * * Any number of plow makers can go with impunity to Moline, and establish there plow factories, and brand on their plows their own name and the name of the town, and send them broadcast over the country, to the joy of our farmers, and to the common benefit of all."

These cases firmly establish the questions of law applicable to the contention we are now to dispose of, and they clearly indicate the result we have reached. A geographical name cannot be appropriated to the exclusive use of any person or company as a trademark, and, if adopted as such, it must be used subject to the right of others doing business in the section of country to which it applies to make like use of it in matters properly pertaining to their business in that locality.

It is clear from the evidence that "Pocahontas" is a word of well-known geographical signification, denoting that large and valuable

section of the Virginias famed the world over for the remarkably valuable and useful coal and coke that it produces. Prior to 1882 this region was comparatively unknown, and entirely in the primeval state in which nature had left it, constituting a part of the Great Flat Top Mountain portion of southwest Virginia and of southeast West Virginia. In the years immediately preceding 1882 this wilderness had been sought out and explored by those who represented the capital and energy by which it was afterwards developed. The experts sent into its theretofore hidden recesses returned with the report of its fabulous wealth and wonderful possibilities. The result was the extension of the Norfolk & Western Railroad into and through the Great Flat Top region, and the organization of the Southwest Virginia Improvement Company, under whose auspices the mines were opened and coal was first shipped. The development inaugurated by this company was commenced during the fall of 1881, continued in the year 1882, and the railroad was completed to the mines in the springtime of the year 1883. The town located at the point where the first mine was opened was early in the year 1882 named Pocahontas, and the post office which was established by the department at Washington on the 30th day of June, 1882, was likewise then called by the same name. The first coal shipped to the tide-water markets left the mines in July, 1883, and it was billed and sold as "Pocahontas" coal. The entire field is now known as the "Pocahontas" and the "Pocahontas Flat Top Coal Field." It embraces large portions of Tazewell and Wise counties in the state of Virginia, and of Mercer, McDowell, Wyoming, and Raleigh counties in the state of West Virginia. It is divided into three sections or working divisions,—the Pocahontas, which includes all the mines around the town of Pocahontas; the Bluestone district, embracing the improvements on the Bluestone river; and the Elkhorn, the country in McDowell county on the Flat Top Mountain. The coal shipped from all this section is known in the markets of the world as "Pocahontas" coal, evidently so called from the town of that name in which the first mine was located, and from which the first shipments were made. The coal beds are above the water level, and range from 5 to 13 feet in thickness, extending through an area of about 500 square miles, or 320,000 square acres. An actual survey of the outcrop of this field discloses that about one-third of the territory is barren, and that there are near 213,000 square acres underlaid with the Pocahontas vein of coal. A moderate estimate gives to each square acre 10,000 tons of marketable coal, or say 2,130,000,000 tons. At the time when this suit was instituted 38 different coal and coke campanies were operating in the field, all of them advertising, mining, and selling the coal excavated from the Pocahontas vein, and known as the "Pocahontas Flat Top Coal." For the manufacture of coke over 5,000 ovens had been constructed and were in use. During the year 1883, 99,871 tons were mined, the output in the following years rapidly increasing, until in 1894 3,888,058 tons were sent to market. For the purpose of illustrating the almost inexhaustible resources of the field, it may be stated

that at this rate of production—as shown by the returns for the year 1894—it would require about 548 years to exhaust the seam now being worked. And it is as to this entire body of coal that the complainants claim the exclusive right to use the word "Pocahontas," as descriptive of its origin and quality.

There is no evidence to sustain the allegation in the bill that the Southwest Virginia Improvement Company began selling coal in the year 1882 from the Pocahontas Mine, nor that it made any sales of "Pocahontas" coal in the year 1883, in the sense that those words are used as a trade-symbol. Nor is there any satisfactory evidence tending to show that said company adopted and used a trade-mark, or made any effort to establish one as such, prior to the year 1885. It is true that in the assignment made by the Southwest Virginia Improvement Company to the complainants it is recited that said company "did adopt, on or about the 1st day of July, 1882, as a trade-mark, the word-symbol 'Pocahontas'"; but surely that statement in such a paper, made under the date of April 1, 1885, cannot be considered as proving that fact, and the record has been searched in vain for testimony establishing it. The first coal sent to market, according to the evidence, was in July, 1883, at which date both the town of Pocahontas and the post office of the same name had been in existence for a year at least. The claim of complainants that the town had no existence until January 31, 1884, the date of the act of the Virginia legislature incorporating it, and that, therefore, it was not known legally, in a geographical sense, prior to such date, is not, in the light of the testimony, and in connection with the important questions herein involved, entitled to the consideration given it by counsel. There can be no doubt but that at the time the first shipment of coal was made by the Southwest Virginia Improvement Company, the town of Pocahontas was in existence, the post office had been established, and that the coal itself was sent from the station of that name. The word "Pocahontas" then denoted the locality at which the article in which the company was dealing was mined, as well as the point from which it was shipped, and it also indicated in business matters the natural product of all that region. It follows, therefore, that it could not then be used as an exclusive trade-mark, and as a matter of fact it was not so employed until some time thereafter. We are impelled to find from the testimony that in the early shipments of coal the word "Pocahontas" was used, not as a word-symbol or trade-mark, but simply as the name of the town from whence it came, for the purpose only of pointing out the place of production. The coal had not then been used, and it had not produced the wonderful results that it subsequently did. Its reputation had not been made, and it had not at that time found its way to the marts of the world, to the furnaces of land and sea. The operators of that section and their vendees, including complainants' predecessors, had not then been given the opportunity to inspect, grade, and purify it, so as to make it typify the high degree of excellence that it now enjoys, and there is no evidence tending to show that selection and inspection were

87 F.—30

then resorted to, other than is usual in all mines. The first direct evidence bearing on the trade-mark is the application of August 25, 1885, made by Castner & Company, Limited, to register the word "Pocahontas," at the United States patent office. Such registered trade-mark is not now relied upon by complainants; why we have not been advised, but likely for reasons connected with the decision of the supreme court in the Trade-Mark Cases, 100 U. S. 82. It is, however, worthy of notice that such application was made under the provisions of section 4937, Rev. St. U. S., which require the party so applying to set forth in the statement made by him the length of time, if any, during which the trade-mark had been in use, and that said applicants in their statement so filed used this language: "This trade-mark has been used continuously by said corporation since about January 1, 1885." The word-symbol or device now claimed by complainants as a trade-mark is founded on the rule of the common law that the person or company first employing it to distinguish the goods made or sold by the owner thereof is entitled to the benefits arising from its exclusive use. The chancery courts of England and of this country have long recognized this privilege, and have enforced it, if the property right of the claimant thereto has been duly established.

As we see this case, the complainants are not entitled to the exclusive right to use the word "Pocahontas," as descriptive of either the locality, or character of the coal mined in the Pocahontas coal field, but all of the producers of that product in-that section have the right to so use it in common with complainants. That word has acquired a generic meaning, and from the evidence before us it is clear that in the business world it is used to indicate the place where the coal is produced, and that it does not point to either the producer or the vendor of the same. All the mine owners who, by their labor, succeeded in establishing their industries in that section, have the right to use in their business the geographical word which is the recognized designation of the same, and that points to the product peculiarly indicative of its wealth; and surely it cannot be that any one of them can inhibit all the rest from exercising the privilege, which was the birthright of the section, and is an advantage common to all who are interested in it. To give to the complainants below the exclusive right they claim in their bill would be to ignore the principle that is the foundation of the protection given to trade symbols and marks.

There remains yet one other allegation of complainants' bill to be considered, and that is the charge that the defendant below, intending to deceive dealers in coal and the public in general, unlawfully offered for sale and sold a very inferior article of coal under the name of "Pocahontas"; that purchasers of the same were liable to be and were misled, and were induced to buy it, as the superior and selected grade usually sold by the complainants; and that thereby the public was deceived, and the reputation of the coal sold by complainants was injured. It is undoubtedly true that complainants, as producers and sellers of coal from the "Pocahontas coal

fields," are, with all other producers and mine operators in that region, interested in maintaining the purity and reputation of the natural product of the same, and that they may cause the defendant or any one else to be inhibited and restrained from selling, or offering to sell, an inferior coal from another region as the coal mined in the Pocahontas field. This they can do independent of the question of trade-mark, or of their right to the exclusive use of one. This allegation that the defendant has been engaged in unfair and fraudulent trade is not supported by the evidence. It has been shown that he was advertising and selling "Pocahontas" coal, but the testimony also shows that the coal he so advertised and sold was in fact from the "Pocahontas coal field." It follows that the representations made by him were neither fraudulent nor untrue, and that he had a lawful right to so advertise and sell. It nowhere appears that he ever represented to the public that he was selling the same article sold by complainants, except as their coal was comprehended by the word "Pocahontas," which also justly described his own. He sold the product of the Browning Mine, which is located adjoining the original mine of the Southwest Virginia Improvement Company, in the town of Pocahontas, the coal from which is now disposed of by the complainants, as "Pocahontas" coal; and it is proven that both collieries excavate from the same vein. As to the right of the Browning Mine, one of the oldest in the field, to sell its product as "Pocahontas" coal, there can be no doubt, and it would be unconscionable to deny it. He also sold from the Indian Ridge Mine, which is located within the "Pocahontas coal field," and it is shown that the complainants are now selling the output of the Rolfe and Arlington Mines as "Pocahontas" coal, both of which adjoin the Indian Ridge Mine. The complainants themselves formerly sold the coal from this mine as "Pocahontas" coal, and it is really difficult to understand why it becomes another article in the hands of the defendant. It is also set forth in the bill that the coal from the Indian Ridge section does not grade as high as that from other portions of the field, and that it had not been carefully inspected by the defendant before it was sold. But the evidence does not sustain this claim, and it appears that the complainants themselves have endeavored to again secure the right to sell this coal as "Pocahontas" coal since it has been so sold by the defendant, and we cannot believe that they would have made this effort had the grade of the product been inferior, or its inspection careless.

The proof does not show that the appellant has practiced any deception upon the public, or that he has perpetrated any fraud upon the appellees. The appellant advertised and was selling coal obtained from the Browning and Indian Ridge Mines, of the "Pocahontas Flat Top region," and he did not represent it as purchased from the appellees, nor as mined by them. He has represented it as coal from the "Pocahontas" field, and it was in fact such coal. He has made no false representations, and he has invaded no right to which the appellees can properly assert a claim. There is error in the decree appealed from, and it is reversed, and this cause is remanded to the court below with instructions to dismiss the bill. Reversed.

## On Rehearing.

(May 19, 1898.)

Richard C. Dale and Henry E. Everding, for petitioners.

GOFF, Circuit Judge. The court has duly considered this petition for a rehearing, and it is ordered that the mandate issue as heretofore directed. The opinion filed in this cause on the 3d day of May, 1898, found error in the decree appealed from, not, as stated in the petition for a rehearing, solely because the complainants below had failed to prove material allegations of their bill of complaint, but also because the court found that the word "Pocahontas" could not be exclusively appropriated by complainants as a trade-mark or word-symbol, for the reason that it was and is a geographical word, in and to which all the people of the section of country to which it refers have the common right of use in connection with their business in such locality. It follows, therefore, that further proofs relating to the same would be unavailing, and it was for this reason that the court remanded the cause, with instructions that the bill be dismissed. The ruling is adhered to. We are clearly of the opinion, not only that complainants below are not entitled to an injunction, but also that there is no equity in their bill, and that, therefore, it will be a useless expenditure of time and money, and cause fruitless delay, to take the evidence mentioned in the petition for a rehearing. The prayer of the petition is refused.