EMIL J. STEHLI v. SOUTHERN EXPRESS COMPANY.

(Filed 4 December 1912.)

**Express Companies—Carriers of Freight—Limitation as to Recovery—Interstate Commerce—Negligence.**

The stipulation in an express receipt providing that no recovery exceeding $50 for loss or damage to a shipment could be had, is invalid, and a recovery of a larger sum is not an interference with the act to regulate interstate commerce, upon the authority of *Mule Co. v. R. R., ante,* 215.

WALKER J., dissenting; BROWN, J., concurs in the dissenting opinion.

APPEAL by defendant from *Cooke, J.,* at June Term, 1912, of GUILFORD.

This action is to recover damages for the loss by negligence of four bales of silk, shipped from High Point to New York under a contract with the defendant, in which the value of the silk was not given, and in which was the following stipulation: "And if the value of the property above described is not stated by the shipper at the time of shipment and specified in this receipt, the holder thereof will not demand of the Southern Express Company a sum exceeding $50 for the loss or damage to the shipment herein receipted for."

The defendant relied on the valuation clause above set out, and contended that the plaintiff could not recover more than $50, and that to permit the recovery of a larger sum would be an interference with the act to regulate interstate commerce.

The jury returned the following verdict:

1. Did the plaintiff, on 11 July, 1908, deliver unto the defendant the four bales of silk described in the complaint, to be safely transported from High Point, N. C., and delivered to the plaintiff in New York? Answer: Yes (by consent).

2. Did the defendant negligently fail to transport and deliver unto the plaintiff, the consignee, in the city of New York, or elsewhere, the four bales of silk described in the complaint? Answer: Yes.

3. Did the plaintiff present to the defendant, at its office in High Point, N. C., a claim for damages for the loss of the goods, in writing, within ninety days after 11 July, 1908, with the original receipt annexed? Answer: Yes.

4. What amount, if any, are the plaintiffs entitled to recover of the defendant on account of the four bales of silk mentioned in the complaint? Answer: $1,999, with interest.

The defendant appealed from a judgment rendered in accordance with the verdict.

*King & Kimball for plaintiff.*
*John A. Barringer and T. H. Calvert for defendant.*

ALLEN, J. It is doubtful if the record presents any question requiring a consideration of the act to regulate interstate com-

merce, but conceding that it does, our views have been presented and the principles controlling the decision of the contentions of the defendant have been declared in *Mule Co. v. R. R., ante,* 215. There are two cases by that title at this term, and the one referred to is the one in which the interstate commerce act is discussed.

We find no error.

No error.

WALKER, J., dissenting: This was an action to recover the value of goods delivered to the defendant for shipment, and lost or destroyed. There was a verdict for the plaintiff and judgment rendered for the full amount claimed, from which judgment the defendant has appealed.

The plaintiff sets out two causes of action, one for breach of contract and the other in tort, for the failure to deliver goods shipped from High Point, N. C., to New York, and alleged the value of the goods to be $1,999, and prayed judgment for that amount.

The defendant answered, alleging that the goods were shipped on a bill of lading or receipt providing that the defendant should not be liable unless the claim should be presented in the time and manner prescribed, and that the claim had not thus been presented; that the contract or receipt provided that if the value of the property was not stated by the shipper, the carrier should not be liable for more than $50 for loss or damage; and that the shipper filled out the blank on which the contract was entered and tendered the same to the defendant for execution, and it was executed in the form tendered. The defendant further alleged that it was a common carrier engaged in interstate commerce, and that its rates for interstate transportation were duly posted and filed with the Interstate Commerce Commission; that the schedule of rates increased according to the valuation of the property shipped, and that the rates applicable to a package of the value of $1,999 would have been higher than to one of $50; that the shipper was charged with knowledge of such schedule of rates, and had actual knowledge of the fact that the rate charged was applicable to a package of the valuation of

$50, and that the acts of the shipper were done for the purpose of procuring transportation of the goods as though they were of the value of $50, whereas the legal rate was higher; and that the shipper knew that he was procuring the transportation at less than the lawful rate applicable to their actual value.

The defendant further alleged that the purpose of the shipper was to obtain, knowingly and willfully, by false billing or false classification, the transportation at less than the regular rates then established and in force, contrary to the provisions of the interstate commerce act and the Elkins act and their amendments; that the shipment was to be transported from High Point, N. C., to New York City, and therefore to be carried in interstate commerce; that the rates, rules, regulations, and classification applicable to interstate shipments were applicable to it; that the acts and doings of the shipper were contrary to law, and that the plaintiffs are not entitled to recover.

The court submitted the following issues to the jury, who made the answers stated:

1. Did the plaintiff, on 11 July, 1908, deliver unto the defendant the four bales of silk described in the complaint, to be safely transported from High Point, N. C., and delivered to the plaintiff in New York? Answer: Yes (by consent).

2. Did the defendant negligently fail to transport and deliver unto the plaintiff, the consignee, in the city of New York, or elsewhere, the four bales of silk described in the complaint? Answer: Yes.

3. Did the plaintiff present to the defendant at its office in High Point, N. C., a claim for damages for the loss of the goods, in writing, within ninety days after 11 July, 1908, with the original receipt annexed? Answer: Yes.

4. What amount, if any, are the plaintiffs entitled to recover of the defendant on account of the four bales of silk mentioned in the complaint? Answer: $1,999, with interest.

The defendant, in apt time, tendered the following issues, which the court refused to submit:

"Is the plaintiff estopped from denying the contract or receipt entered into and given by the defendant to the plaintiff on 11 July, 1908? Answer: ........

"Did the plaintiff write in the contract the following words, 'Value asked and not given,' to avoid the payment of the tariff of 10 per cent on the $100 valuation? Answer: ........."

The plaintiff's evidence showed the following facts: On 11 July, 1908, the plaintiffs delivered to the defendant four bales of silk for shipment to New York. The goods were delivered by the shipper to a driver of an express wagon at the door of the shipper's office, and the driver signed the receipt and handed it back. The receipt for this shipment was filled out by the clerk of the shipper, who inserted the words, "Value asked, but not given." The receipt was for the four bales. It appears from the testimony of the superintendent of the factory, who had charge of this part of the plaintiffs' business and who testified for the plaintiffs, that the plaintiffs knew that the rate they were paying was not the legal rate for the class of goods shipped. He testified as follows: "We did get a less rate by putting in the words, 'Value asked, but not given,' than we would have gotten if we had stated the actual value of the goods in the receipt. When we inserted the words, 'Value asked, but not given,' we only paid the rate as to pounds, and not as to value. We had been doing this for a number of years." The witness had previously testified that he had been filling out such receipts or contracts, "Value asked, but not given," for five years. An employee of the plaintiffs testified that she was working for them on the date of this shipment, and then said: "I was in the habit of filling out these receipts in the office, 'Value asked, but not given,' prior to that time, since I had been there."

The bill of lading or express receipt was read in evidence by the plaintiff, and in part provides: "If the value of the property above described is not stated by the shipper at the time of the shipment and specified in this receipt, the holder thereof will not demand of the Southern Express Company a sum exceeding $50 for the loss or damage to the shipment herein receipted for." The defendant's evidence shows that the goods were delivered to a driver, who receipted for them, and were then carried to an express car, in charge of an express agent or messenger. The agent of the defendant at High Point testified

that notices were posted in the office of the express company, stating that the tariffs were subject to the inspection of the shipper; that the charges depended not only upon the weight, but also upon its value, and that failure or refusal to give the full value of the shipment and thereby secure a lower charge for transportation is illegal. The agent further testified that the tariff rates of the express company were in the office on the billing counter, right in front of the desk; that they were open to the inspection of anybody, and that they were filed with the Interstate Commerce Commission. Another witness for the defendant, who was employed in the office of the defendant at the time this shipment was made, testified that the book of classifications and freight rates was on the billing counter and open to anybody for inspection. The book of tariffs and classifications · in possession of the agent of the defendant was offered in evidence and excluded.

The exceptions and assignments of error relied on by the appellant are grouped and discussed under the following heads:

First. The court erred in excluding the book of classification and rates.

Second. As the motions to nonsuit were . denied, the court erred in refusing to charge the jury that the plaintiffs' recovery should be limited to $50.

Third. The court erred in overruling the motions to nonsuit.

The fifth assignment of error ,is taken to the refusal of the court to allow the introduction in evidence of a book of rates and classifications which the witness had in his hand in the courtroom, and which was on file in the office of the Southern Express Company at High Point, N. C., on 11 July, 1908. The agent of the defendant at High Point had testified that the tariff rates of the express company were in the office on the billing counter, and open to the inspection of anybody; that they were filed with the Interstate Commerce Commission. It appears that the book of rates and classification from the High Point office, in possession of the agent, the witness, was offered in evidence, and the court took the matter under advisement. When the question was again brought up, the court refused to admit the book.

The sixth assignment is to the ruling sustaining an objection to a question asked a witness for defendant, who was a clerk in the express office at the time this shipment was made: "Were shipments made according to the classifications and rates in that book?" (Page 49.) The seventh assignment is to sustaining an objection to a question asked the same witness: "State whether or not the Southern Express Company acted upon that book in the shipments that were made over the Southern Express Company's line."

The above assignments of error present the points that the book of rates and classifications testified to by the agent as being in use in the express office should have been admitted in evidence by the court as the proper record of the alleged rates and classifications in force, and that the questions ruled out were admissible to identify the book excluded. Upon the testimony of the agent, it was urged by the defendant that the book should have been received under the acts of Congress making it the duty of the carrier to file copies of the schedules and rates with the Interstate Commerce Commission and post them in the local offices; making it a misdemeanor for a carrier to fail to file them; declaring that a carrier shall not engage in the transportation of goods unless the rates have been filed; and declaring that a carrier willfully permitting anything to be done declared unlawful by the act shall be deemed guilty of a misdemeanor. The following are the material parts of the acts of Congress which are considered applicable to this question:

"Every common carrier shall file with the Commission schedules showing all the rates, fares, and charges for transportation. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier." Act of 1887, sec. 6, as amended by Act of 1906, sec. 2.

"The willful failure upon the part of a carrier subject to said acts to file and publish the tariffs or rates and charges as required by said acts, shall be a misdemeanor." Act of 1903, sec. 1, as amended by Act of 1906, sec. 2.

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or prop-

erty, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act." Act of 1887, sec. 6, as amended by Act of 1906, sec. 2. "That any common carrier who shall willingly suffer or permit to be done any act, matter, or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, or shall willfully omit or fail to do anything or things in this act required to be done, or shall cause or willingly suffer or permit any act, matter, or thing so directed or required by this act to be done not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this act, or shall aid or abet therein, shall be deemed guilty of a misdemeanor." Act of 1887, sec. 10, as amended by Act of 1889, sec. 2.

It is argued by the defendant, under the above statutory provisions, that when a custodian of a book of classifications and rates identifies such book as in use in his department, it must be presumed that the requirements of the law have been fully complied with in the matter of filing and posting the schedules of the rates and classifications. As this is the legal duty of the defendant, and especially as the failure to comply with the law is declared to be a crime, the burden cannot be cast, even in a civil case, upon the carrier to show that it is innocent of crime. The burden was upon the plaintiffs to show, if such was the fact, that the defendant had not duly filed the rates and classifications with the Interstate Commerce Commission, and that therefore the book offered and excluded did not show the established and legal rates and classifications. "The presumption in favor of innocence of crime is not restricted to proceedings instituted for the purpose of punishing the supposed offense, but applies equally in all proceedings, for whatever purpose, whether the guilt of the person comes in question directly or collaterally." 22 Am. and Eng. Enc. of Law, title "Presumptions," page 1282. "The general maxim, that all things are presumed to have been rightly done, is applied in many ways, in the form of variously expressed presumptions, all in effect amounting to the same

thing, that misconduct and illegality of any kind will not ordinarily be presumed, but must be proved." 9 Enc. of Ev., title "Presumptions," page 917. "It has been held that the presumption of innocence also applies in civil cases where one party is charged with conduct of a criminal nature. But this appears to be merely another statement of the general proposition that honesty and lawful actions are presumed, and the burden of proof is on the party maintaining the contrary." *Ibid.*, page 925. "The presumption against illegality, and its equivalent expressions, that there is no presumption against legality, or in favor of illegality; that there is a presumption' in favor of legality; that facts consistent with legality are presumed to exist, or that where a situation is explainable on the basis of legality it will be assumed that such is the true explanation, present a rule of administration that he who claims the existence of illegality must prove it." 16 Cyc., title "Evidence," page 1082; *Macey v. Stark,* 116 Mo., 480; *State ex rel. Gracey v. Bank,* 25 S. W., 372; *McCallister v. Ross,* 55 S. W., 1027, and especially *Adams Express Co. v. Carnahan,* 68 N. E., 647.

It will be presumed, in the absence of evidence to the contrary, that every common carrier engaged in interstate commerce has complied with the statute establishing rates and of printing, filing, publishing, and posting them. *Meeker v. Lehigh Valley R. R. Co.,* 163 Fed., 354, and *Adams Express Co. v. Carnahan, supra.* The book of rates should have been admitted.

Second. The fourteenth assignment of error is taken to the following part of the charge of the court: "Now, as to the third issue, if you answer the second issue 'Yes,' that defendant negligently failed to transport and deliver to the plaintiffs, the consignees, in the city of New York or elsewhere, the four bales of silk described in the complaint, the court instructs you to answer the fourth issue. '$1,999.99.' If you answer the second issue 'No,' then you will answer the fourth issue '$50.'" The fifteenth assignment is taken to the following part of the charge: "A man cannot limit his liability upon a contract against the consequences that result from a tort, and negligence is a tort; and he cannot contract against liability for the damages that a man would be entitled to recover for the loss of his property,

caused by a failure in the performance of a duty which he owes, not only to the individual, but to the public, that is, to exercise reasonable care." The twentieth assignment is taken to the refusal of the court to instruct the jury as requested, viz.: "If the jury find the facts to bé as testified to by all the witnesses in this case, then the plaintiff is entitled to recover only the sum of $50, the amount set forth as the value of the goods in the receipt bearing date 11 July, 1908." And the nineteenth assignment of error is taken to the refusal of the court to submit to the jury the following issues: "Is the plaintiff estopped from denying the contract entered into and receipt given by the defendant to the plaintiff?" "Did the plaintiff write in the contract the following words, 'Value asked and not given,' to avoid the payment of the tariff of 10 per cent on the $100 valuation?"

The defendant argued that, as the court had overruled the motions to nonsuit, which are discussed hereafter, it properly presents, by the above assignments of error, the point that if the plaintiffs are entitled to recover anything, the recovery cannot exceed the contractual limitation of $50, because it appears conclusively from the testimony of the plaintiffs' superintendent that the plaintiffs knew that they were shipping the goods under a false classification, and thereby obtaining an illegal rate. In this càse, the evidence is undisputed, and in fact it conclusively appears from the testimony of the plaintiffs' own witness that they knew that they were obtaining an illegal rate. This evidence is considered in the discussion of the motions to nonsuit.

Third. The defendant submitted motions to nonsuit, at the close of the plaintiffs' evidence and when all the evidence on both sides was in, and excepted to the rulings of the court overruling the motions, and the fourth and eighth assignments of error are based on these exceptions. It is argued, on this branch of the case and upon the facts disclosed, that the plaintiffs knowingly received a rebate, concession, or discrimination by reason of the false classification of the goods shipped, that they thereby brought the shipment and themselves under the prohibitive and criminal provisions of the acts of Congress of 1887, 1889, 1903,

and 1906. The following statutory provisions clearly define the liability of a shipper and a carrier acting in violation of the statutes, omitting immaterial parts:

"It shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereof, whereby any·such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination practiced. Every person or corporation, whether carrier or shipper, who shall knowingly offer, grant, or give or solicit, accept, or receive any such rebate, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than $1,000 nor more than $20,000: *Provided*, that any person, or any officer or director of any corporation subject to the provisions of this act, or the act to regulate commerce and the acts amendatory thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, who shall be convicted as aforesaid, shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court." Act of 1903, sec. 1, as amended by Act of 1906, sec. 2. "Any person and any officer or agent of any corporation or company who shall deliver property for transportation to any common carrier, and who shall knowingly and willfully, by false billing, false classification, whether with or without the consent or connivance of the carrier, its agent or agents, obtain transportation for such property at less than the regular rates then established and in force on the line of transportation, shall be deemed guilty of fraud, which is hereby declared to be a misdemeanor." Act of 1887, sec. 10, as amended by Act of 1889, sec. 2. "In construing and enforcing the provisions of this section, the act, omission,

or failure of any officer, agent, or other person acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or shipper as well as that of the person." Act of 1903, sec. 1, as amended by Act of 1906, sec. 2.

Under the foregoing statutory provisions, the defendant contends:

1. That an agreement to ship goods at less than the published rate is illegal.

2. That when a rate is given and obtained at a lower rate than the legal rate, and the shipper knows that it is less than the legal rate, a criminal offense has been committed.

3. That when a contract has been entered into which is void, the aid of the courts cannot be invoked by a party *in pari delicto,* especially when the terms of the contract involved the commission of a crime.

As to the first of the above propositions, reliance is laid on the statutory provisions. As showing how strictly both the shipper and the carrier are held to account for a violation of the statute, the case of *Chicago and Alton Ry. Co. v. Kirby,* 32 S. C. Rep., 648, holds that a shipper cannot recover damages for a breach of the carrier's special agreement by which, contrary to the Act of 4 February, 1887, sections 3, 6, and the Act of 19 February, 1903, it undertook, for the regularly established joint through rate, to expedite a car-load shipment of horses over its lines so that it would reach the point of connection with the next carrier in time to be carried by a special and fast stock train, although the shipper did not see or know that the established rates and schedules made no provision for such special service. It has been held that a contract for less than the schedule rates, induced by mistake, is unlawful and cannot be enforced, and there cannot be a recovery of an amount collected in excess of the contract rate. *Houston, etc., Ry. Co. v. Dumas,* 43. S. W., 609.

As to the second proposition, defendant relied on the case of *Armour Packing Co. v. U. S.,* 209 U. S., 56. In that case it was held that a device or contrivance, secret or fraudulent in its nature, is not essential to sustain the conviction of a shipper

STEHLI *v.* EXPRESS CO.

the Elkins Act of 1903 making it a criminal offense for any person or corporation to offer, grant, solicit, give, or accept or receive any rebate, concession, or discrimination in respect to transportation of property in interstate commerce, whereby any such property shall, by any device whatever, be transported at less than the carrier's published rates, or whereby any other advantage is given or discrimination practiced. It was contended in the above case by the defendant, the plaintiff in error, that in order to warrant a conviction, the shipper must be guilty of some bad faith or fraudulent conduct in the use of the device or obtain the rebate by some intentionally dishonest or underhand method, concession, or discrimination denounced by the act. But the Court said: "The Elkins Act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published, and posted as required by law. It is not so much the particular form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates different from the fixed rates, duly posted and published."

On the third point, it was especially insisted that the motions to nonsuit should have been granted, and that the court erred in overruling them, the evidence conclusively showing that the plaintiffs knew the goods were being shipped under a false classification and that an illegal rate was being received. The plaintiffs' own witness, who was superintendent of the factory, testified that, "I have been filling out the contracts or receipts 'Value asked and not given' for five years. We did get a less rate by putting in the words 'Value asked and not given' than we would have gotten if we had stated the actual value of the goods in the receipt. When we put 'Value asked and not given' we only paid the rate as to pounds, and not as to value."

In *Ellison v. Adams Express Co.*, 245 Ill., 410, it was decided that a contract knowingly made in violation of a statute is void, and there can be no legal remedy for its breach where there is

nothing in the statute from which it may be inferred that it was
the legislative intent to limit the scope of the act to the exaction
of a penalty from the wrongdoer and relieve him from the ordi-
nary consequences of making a contract forbidden by law (*Ober
v. Katzenstein, ante,* 439) ; and that a shipper who, for the
purpose of obtaining a lower rate of carriage, knowingly and
intentionally violates the provision of paragraph 3 of section
10 of the interstate commerce act by refusing to disclose to the
carrier the value of the merchandise delivered to him, cannot
recover in case the merchandise is destroyed, as his contract is
void. The Court said : "Nor in the subject-matter of the legis-
lation do we find anything to justify a presumption that Con-
gress intended to relieve wrongdoers of the ordinary effect of
their acts. Compliance with the requirements of the act by the
shipper as well as by the carrier is essential to its successful
operation, and we cannot presume that Congress intended that
the contracts forbidden by it should be valid and should be en-
forced to the same extent as if there were no prohibition, merely
subjecting the offender to the penalty if detected and prosecuted.
We see no reason which excepts this case from the rule that a
contract entered into in violation of an express statutory pro-
hibition cannot be made the basis of an action in a court of
justice." See also *Church v. Ry. Co.,* 14 S. D., 443. This con-
tention of the defendant and the above authorities are based on
the rule that courts will not entertain jurisdiction to aid a party
in a matter arising out of an illegal contract, when such party
was *in pari delicto.*

"No principle of law is better settled than that a party to an
illegal contract cannot come into a court of law and ask to have
his illegal objects carried out; nor can he set up a case in which
he must necessarily disclose an illegal purpose as the groundwork
of his claim." 9 Cyc., p. 546. This rule is well established in
this Court, and has recently been recognized. *Smathers v. In-
surance Co.,* 151 N. C., 98; *Edwards v. Goldsboro,* 141 N. C.,
60; *King v. R. R.,* 147 N. C., 263.

It cannot be successfully contended that there was not *par
delictum* on the part of the shipper. The history of the statutes,
the evils they were intended to remedy, and the amendments to

the statutes which from time to time it was found necessary to make in the effort to suppress those evils, show that Congress found that it was necessary to extend the prohibitions to the shippers as well as to the carriers. It is well known that in many instances the carriers were at the mercy or under the powerful influence of the large shippers, and that those powerful influences could not be shaken off by the provisions of the statute as originally enacted in 1887, directed as it was exclusively to the acts and conduct of the carriers. An analysis of the statutes up to and including the act of 1906, and as they were in force when this shipment was made, will show that the provisions are substantially identical as to the illegality of giving rebates and concessions to the shipper, and that when an act by a carrier is declared to be a misdemeanor, the correlative act of a shipper, when knowingly done, is also brought under a like statutory denunciation.

As it appears, in any view of the facts testified to by the plaintiffs' own witnesses, that the plaintiffs have no cause of action, and that further proofs of a character to change the result are not possible, this Court, on sustaining the nonsuit, should direct judgment to be entered in the court below. *Mansfield v. New York,* 165 N. Y., 208; *Coffman v. Costner,* 87 Fed., 457; *Stover Mfg. Co. v. Mast,* 89 Fed., 333. "Where, on appeal from a judgment in favor of the plaintiff below, the appellate court decides that plaintiff has not a cause of action and cannot succeed on another trial, it will not order a new trial on reversing the judgment, but will itself render the proper judgment, or order it rendered in the lower court. Thus, where it is apparent that there can be no new evidence introduced by the party against whom a reversal is pronounced, to change the aspect of the case, a new trial will not be ordered." 3 Cyc. (title "Appeal and Error"), 452.

The above is a résumé of the position taken by defendant in the court below and of the reasoning by which it was sustained. We have followed somewhat closely the outline of the argument submitted by defendant's counsel, so as to show how the case proceeded in the court, and it appears therefrom, among other adverse rulings, that defendant was deprived of the proof offered

as to the official classification and rates; whereas, if my contention is the right one, it was clearly entitled to this evidence. If I am wrong, the ruling of the court was correct, as it would be idle to hear any evidence as to classification and rates, if it has no legitimate bearing upon the issue. It would be useless to do more than state the proposition, that Congress has the power under the Constitution, as construed by the courts, to regulate commerce between the States; to take exclusive control of the subject and to occupy the entire field, if it sees fit to do so. That it has done so, to the extent, at least, of making the question now before us one of Federal law, would seem not to admit of doubt. The Interstate Commerce Commission assumed jurisdiction to pass upon a question very similar to the one in hand, and held that the agreed-value clause in the bill of lading was a valid stipulation. *Shaffer v. R. R.,* 21 I. C. C. Rep., 8. But I do not care to pursue the discussion of this subject, as the reasons and authorities in support of my views are fully given in *Mule Co. v. R. R., ante,* 238, by *Justice Brown* in his dissenting opinion, concurred in by me. If the value of the article transported is one element by which the rate may be determined, or may form the basis of the rate, and it has been held by the highest authority that it is of that character, then it would seem to follow inevitably that the whole question of value and rate is taken into the domain of Federal law and jurisdiction, and the decisions of the Federal courts are, therefore, of binding effect upon us.

I will direct my attention more particularly to the validity of the stipulation itself. It is not an agreement for exemption from negligence, but has been regarded by the great weight of authority as a proper method by which to measure the amount of loss; to apprise the carrier of the nature of the duty he is undertaking and of the degree of care to be used by him in its performance; to guard the carrier against imposition or fraud; to secure a due proportion between the amount for which the carrier may be responsible and the freight he receives, and to protect him against extravagant and fanciful valuations. *Hart v. R. R.,* 112 U. S., 331. In that case the Court said, in support of the rule: "If the shipper is guilty of fraud or imposi-

tion, by misrepresenting the nature or value of the articles, he destroys his claim to indemnity, because he· has attempted to deprive the carrier of the right to be compensated in proportion to the value of the articles and the consequent risk assumed, and what he has done has tended to lessen the vigilance the carrier would otherwise have bestowed. 2 Kent's Comm., 603; *Dunlap v. Steamboat Co.,* 98 Mass., 371; *R. R. v. Fraloff,* 100 U. S., 24. This qualification of the liability of the carrier is reasonable, and is as important as the rule which it qualifies. There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its· value is a less sum than that claimed after a loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier. The effect of the agreement is to cheapen the freight and secure the carriage, if there is no loss; and the effect of disregarding the agreement, after a loss, is to expose the carrier to a greater risk than the parties intended he should assume. The agreement as to value, in this case, stands as if the carrier had asked the value of the horses, and had been told by the plaintiff the sum inserted in the contract." In *Bernard v. Adams Express Co.,* 91 N. E. Rep. (Mass.), 325, the Court had under consideration the validity of a clause in a bill of lading precisely like that in this case. It followed *Hart's case,* and held: "It is not in any proper sense a contract exempting him from liability for the loss, damage, or injury to the property, as the shipper describes it, in stating its value for the purpose of determining for what the carrier shall be accountable upon his undertaking, and what price the shipper shall pay for the service and for the risk of loss which the carrier assumes. The cases cited above do not go upon the ground that there is a contract of exemption from liability for negligence, but upon the ground that the contract relates directly to the elements and quality, as to value, of that which is to be transported. . . . An estoppel, founded on the agreements of the parties as to the nature or value of the property, is not an exemption from the liability recognized by the common law and affirmed in this statute (interstate com-

merce act) as resulting from the ordinary undertaking of a carrier to transport property. The decision in *Greenwald v. Weir,* 130 App. Div., 696, 115 N. Y. Supp., 311, is to this effect. A very elaborate discussion of the law, with a citation of many authorities, by the Interstate Commerce Commission, is found in *In re Rules and Rates,* 13 I. C. C. R., 550, which reaches the same result." The Court, in that case, quotes with strong approval what is further said in the *Hart case,* as follows: "The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss." The following cases sustain the principle, where the same facts were presented: *Greenwood v. Barrett,* 199 N. Y., 170; *Travis v. Wells-Fargo Express Co.,* 79 N. J. L., 83; *Greenwald v. Weir,* 115 N. Y. Supp., 311. Those cases hold that section 20 of the Interstate Commerce Act of 1906 does not change the rule. In the *Travis case* the Court said: "It was not intended (by section 20) to abrogate the right to limit liabilities for loss in accordance with the amount paid for carriage."

*Judge Emlin McLain* has considered the authorities and summed up the law and stated the clear result, as follows, in 6 Cyc., p. 400: "Although there has been difficulty in distinguishing between a *bona fide* agreed valuation, which is made the basis of the assumption of the duty to transport, on the one

hand, and the rate of consideration to be paid, on the other, and an arbitrary limitation of liability to a stipulated amount, such a distinction manifestly exists. And the weight of authority is in support of the proposition that a valuation mutually agreed upon as furnishing the basis of the liability assumed and the compensation to be paid is valid." He says that the rule, while strongly supported in many cases cited in the notes to the text, has not met with universal acceptance, and that there are cases in which a contrary view has been expressed, "although it is believed that an examination of these cases will develop the fact that the real point involved in sustaining an agreed valuation has not been fairly apprehended." He further states the doctrine in this form, and buttresses it with the citation of numerous cases in the notes: "It has already been suggested that where by fraudulent concealment of the shipper for the purpose of avoiding payment of increased charges for transportation the carrier is induced to accept goods under the belief that they are of ordinary character and value, while in fact they are of such exceptional character or value as that a higher rate would have been charged if the facts had been known, the transaction constitutes such a fraud as to relieve the carrier from liability for the exceptional value. And in accordance with this principle, it is generally held competent for the carrier by contract or notice brought to the attention of the shipper to stipulate that he shall not be liable for the goods beyond a certain named sum, unless the value in excess of that sum is disclosed to the carrier and an increased compensation paid in accordance with the increased value, and such stipulation will be valid, even in case of loss by negligence."

Applying this principle to the admitted facts of this case, the judgment, in my opinion, is not in accordance with the well-settled law in this country, as the great majority of decisions are contrary to what we are about to hold. The plaintiffs entered the words in the receipt, "Value asked, but not given," well knowing what the package contained and that its value was far in excess of the amount they had named in the receipt, and, further, that defendant was ignorant as to the true contents of the package or its value. Plaintiffs also knew that a much

higher rate would be charged if the contents were known, and in order to conceal the facts and obtain the lower rate, they made the false representation as to the real value of the silk and got the lower or pound rate. The courts have, with singular unanimity, decided that such a transaction is fraudulent and the plaintiff is estopped, by reason thereof, from showing the real value for the purpose of recovering it in spite of his deceitful representation. Good faith and fair dealing, they say, both require the rigid application of the rule of estoppel, for such estoppels are based upon principles of morality. The rule, as specially applicable to the facts here, is well stated in *Magnin v. Dinsmore,* 62 N. Y., 35, as follows: "Where a carrier, by his contract, limits his liability to a specified amount, if the value of the property is not stated by the shipper, and the goods are of greater value than the amount specified, silence alone, on the part of the shipper, as to the real value, although there be no inquiry by the carrier and no artifice to deceive, is fraud in law which discharges the carrier from liability for ordinary negligence. Where the shipper accepts carriage upon the terms of a limited liability, silence is the same as an assertion of little value; and the carrier is not only thereby deprived of his adequate reward, but is misled as to the degree of care and security which he should provide." *Chief Justice Folger* said in that case: "The defendant now insists that the imposition and deceit upon it, of the plaintiffs, amounting to fraud, relieved it from liability for the loss. It was the duty of the plaintiffs not to practice imposition and deceit upon the defendant so as to add to its risk and to lessen its care and diligence. (*Orange County Bank v. Brown,* 9 Wend., 116). Though the duty of a common carrier, and the rigorous liability which is upon him at common law, arises principally from the public employment which he exercises (*Coggs v. Bernard,* 2 Ld. Ray, 917, 918; per *Lord Holt, C. J.,* in *Lane v. Cotton,* 12 Mod., 485; Story on Bailments, sec. 549), yet his hire and reward also enter therein, and he has a right that his compensation shall be in measure with the risk he takes, and that he shall not be subject to unknown hazards. (9 Wend., *supra.*)

"The defendant insists that there was a fraud wrought upon it by the plaintiffs, in their failure to disclose the real value of the package and the nature of the contents; that the silence of the plaintiffs, and the alleged deceptive form, dimensions, and general appearance of the package, were an imposition and de-ception. A shipper may become chargeable with fraud upon a carrier, through imposition and deception, as well when he is silent as when he speaks that which is untrue. A neglect to disclose the real value of a package and the nature of its con-tents if, therewith, there is that in its form, dimensions, and other appearance designed, and even, if not designed, if fitted, to throw the carrier off his guard, will be conduct amounting to the fraud now spoken of. The intention to impose upon the carrier is not material, if such is the practical effect of the con-duct of the shipper." He refers to the case of *Batson v. Dono-van,* 4 Barn. and Ald., 21, in which a box, locked and corded, and containing bills, checks, and notes, which was valued by the shippers at £4,000, was deposited with the carrier, with this statement: "It is a box for New Castle." Nothing else was said. The business of the owners of the package was known to the carrier, and they knew of the notice given by the carrier, limiting its liability. The Court of King's Bench held that it was a special acceptance, and though the question as to whether plaintiffs dealt fairly with the defendant in not apprising them that the box contained articles of value, was left to the jury, it was finally decided, on a rule *nisi,* that as matter of law "the facts of a limited liability by notice, and of silence as to value, were enough to debar the shipper of a recovery" of the real value.

The facts of our case are stronger for the defendant than were those in the two cases mentioned for the defendants in them, for here there was an active and not merely a passive representa-tion—a misrepresentation in fact and in law. I will not attempt to vindicate the absolute fairness and justness of the rule, thus laid down in England and in this country, and sustained by the very greatest weight of judicial opinion, as the question is fully, ably, and learnedly discussed in the two cases cited, and the authorities by which it is supported are extensively noted and considered.

We do not reach the charge of negligence, because the first and decisive question in the case is the one of fraud, or, to be technically more accurate, of estoppel founded upon fraud, and it can make no difference whether it is fraud in law or in fact. Where the plaintiffs accuse the defendant of negligence for the purpose of receiving the real value of the goods, the latter may justly and unanswerably retort: It is not a question of negligence, for you have been guilty of a fraud and deceit which prevented me from exercising that degree of care which I would have used but for your fraud, which misled me and put me off my guard, and by no principle of law or good morals can you fairly accuse me of negligence. You cannot take advantage of your own wrong. I will pay according to my contract, but no more. But the cases nearly all show that the rule applies even if there has been no negligence. *Hart v. R. R., supra.*

I therefore conclude: (1) That the question involved is one of Federal law, and the decision of the Federal court of last resort is controlling upon us. *Hart v. R. R., supra.* (2) That as plaintiffs' act in concealing the true value and, thereby obtaining not only a lower and preferential rate, but one not prescribed in the tariff or schedule of rates, was contrary to the express provisions of the interstate commerce act, and being prohibited by law, no recovery can be had for the real value of the goods. It is a tainted transaction and condemned by the law. (3) That plaintiffs are estopped to allege negligence and recover the actual value of the silks, because of the estoppel arising out of the fraud he practiced upon the defendant, and which prevented him from bestowing proper and adequate care for the safety of the goods. (4) Plaintiffs fixed the value of the package themselves, without any suggestion or participation of defendant. It was their own value, fairly and voluntarily put upon the package, and they should not now be heard to allege that they falsely represented it, when they have had the benefit of the carriage at a much lower rate, and in order to recover the real value, which they fraudulently concealed. If such a recovery is permitted, plaintiffs will have successfully

taken advantage of their own wrong, and will be rewarded for their own iniquity, contrary to a just, sensible, and cardinal maxim of the law.

BROWN, J., concurs in the dissenting opinion.